[Civ. No. 9497.   Third Dist.   Apr. 24, 1959.]

J. B. SHOOPMAN, Plaintiff and Appellant, v. PACIFIC GREYHOUND LINES (a Corporation) et al., Respondents; ALMA LEWIS et al., Defendants and Appellants.

Frank H. McAuliffe and Laura O. Coffield for Plaintiff and Appellant.

Taft, Wright & Hopkins for Respondents and Defendants and Appellants.

SCHOTTKY, J.—This is an appeal by plaintiff J. B. Shoopman from an order granting Pacific Greyhound Lines, a corporation (hereinafter referred to as ''Greyhound''), a nonsuit and from an order granting a new trial to defendants Alma Lewis Simic, sued herein as Alma Lewis, and Dave Compton in an action to recover damages for malicious prosecution. Alma Lewis and Dave Compton have filed an appeal from the judgment in the event that this court reinstates the judgment.

Prior to May 23, 1956, Shoopman, a former driver for Greyhound, asked one of the Greyhound drivers to pick up a shaving kit which had been left in a storage locker in the Santa Rosa Greyhound depot. On May 23, 1956, Shoopman went to the bus depot in Calistoga to meet a driver with whom he intended to play golf. The bus depot was located in a building which had a large sign reading ''Greyhound Bus Depot.'' The interior had a ticket office, a small candy counter, amusement devices, and was apparently a waiting room. According to Shoopman's testimony he noticed his shaving kit on the ''sign-in'' desk. A waybill was attached. The charges on the waybill were $3.37. After some discussion regarding the amount due and the fact that there was a tooth brush and a razor in the kit, Shoopman stated that he would not pay the bill. Davis, a Greyhound driver, who was present took out the razor and tooth brush and said that defendant Lewis could send the empty kit back to Greyhound in Santa Rosa. Shoopman testified that Alma Lewis then gave him a large envelope to put the items in and he and the driver then left.

According to Alma Lewis she saw Shoopman and Davis

handling the kit. She saw Shoopman take some articles from the kit. She reported the incident to Dave Compton, the agent, who reported the incident to the police. Shoopman was arrested the same evening and remained in jail until June 1, 1956, when he was arraigned on a charge of theft. The complaint which was signed by Alma Lewis on June 1st, under instructions from Dave Compton, charged that plaintiff Shoopman "did willfully and unlawfully take away personal property of another, to wit, PACIFIC GREYHOUND LINES, INCORPORATED, of a value not exceeding the sum of Two Hundred Dollars ($200.00), to wit, the sum of Two Dollars ($2.00) in violation of Section 484 of the Penal Code of the State of California." After the arraignment he was returned to jail, where he remained until June 19, 1956, when he was taken to court for trial. The district attorney did not appear, and after a telephone call by the judge to the district attorney the case was dismissed with prejudice and Shoopman was released from custody.

At the time of the arrest Shoopman was employed as a route driver for a bakery concern. He testified that his weekly earnings were approximately $135 a week. After his release from jail he was unable to continue his employment with the bakery firm because it had replaced him with a new driver. About five weeks after his release he was able to obtain a job as a cab driver for $9 a day, and then he became a bartender at a wage of $77.50 a week.

When Shoopman was arrested he was booked for investigation of violation of probation. The booking entry of the Calistoga police had an entry "Call from Judge Stone re don't need any A D a complaint on Shoopman. Just pick him up and hold him on suspicion of violation of probation. Hold for 32 hours without bail."

Dave Compton was the Greyhound ticket agent in Calistoga. The contract between Greyhound and Compton dated April 16, 1948, set forth his duties in detail. These duties were required to be performed in a manner satisfactory to Greyhound. The facilities the agent was required to furnish had to be to the satisfaction of Greyhound; reports were to be furnished at such times and in such a manner as Greyhound required; and representatives of Greyhound were to be permitted to inspect and check all the property at reasonable times and inspect and audit all records pertaining to Greyhound's business. The contract further provided that the agent was an independent contractor.

The only testimony in the record from which it can be inferred that Greyhound had knowledge of the incident was testimony by Compton that he phoned Mr. Brown at Santa Rosa. The following testimony of Compton appears in the record: " 'Q. Did you get in touch with any authorities of Greyhound concerning the matter? A. Yes. Brown. He is the —I don't know whether he is called the Supervisor or what, of that district. In other words, he is in charge of that, keeps everything. In other words, any complaint or any trouble of any description goes through Brown. Q. Will you tell me about when it was that you notified him? A. Oh, I think it was the following morning. If I remember correctly, I believe I put a phone call in that afternoon for him; he wasn't in, so I phoned him the next morning. Q. That will be the 24th, was it? A. I believe so.' Q. Are those the answers you gave to those questions at the time of taking your deposition? A. Yes, that is right. Q. Well then, you did get in touch with Mr. Brown, didn't you? A. I don't remember whether I got in touch with him by phone or not. However, as I mentioned here before, I talked to Mr. Brown at the Greyhound office.''

Mr. Irving Brown, who stated that he is District Sales Representative for Western Greyhound Lines, testified that he did not recall receiving any phone call concerning Mr. Shoopman. After having the hereinbefore quoted testimony of Compton read to him and being asked if it refreshed his recollection, he stated: ''A. No, sir, it does not. It may have been, but I don't recall the conversation.'' Mr. Brown testified that he discussed the matter with Compton after he had read an article in the newspaper about a suit against Greyhound.

Appellant's first contention is that the court erred in granting the motion for nonsuit as to respondent Greyhound. Appellant argues, (1) that Compton and Alma Lewis were agents of Greyhound rather than independent contractors; (2) that the acts of Compton and Lewis were within the scope of their employment; and (3) that even if Compton and Lewis were found to be independent contractors, the jury could hold Greyhound responsible on the basis of Greyhound's ratification of their acts.

In considering whether or not a judgment of nonsuit was proper, an appellate court under well-established rules must ''resolve every conflict in their testimonies in favor of plaintiff, consider every inference which can reasonably be

drawn and every presumption which can fairly be deemed to arise in support of plaintiff, and accept as true all evidence adduced, direct and indirect, which tends to sustain plaintiff's case." (*Lashley* v. *Koerber*, 26 Cal.2d 83, 84 [156 P.2d 441].) In the light of this rule and after a careful study of the record, we have concluded that the court erred in granting Greyhound's motion for a nonsuit.

█ We believe that the evidence is sufficient to support a finding that Compton, Alma Lewis's employer, was an agent of Greyhound and not an independent contractor. █ In determining whether or not a person is an independent contractor or an employee, the most important factor is the right to control the manner and means of accomplishing the result desired. If the employer has the power to exercise complete control, an employer-employee relationship exists. (*California Employment Com.* v. *Los Angeles Down Town Shopping News Corp.*, 24 Cal.2d 421 [150 P.2d 186].) █ The agreement between Compton and Greyhound is such that as a practical matter by the terms of the agreement Greyhound has the power to exercise complete control over the agent in the operation of the agency.

The mere fact that the agreement provided that Compton was an independent contractor does not compel a finding that in causing the arrest of appellant he was not acting within the scope of his employment as agent.

In an annotation on Malicious Prosecution—Act of Employee, in 18 American Law Reports 2d, it is stated at page 425:

"Section 21. Station or ticket agent.

"Whether or not the act of a station or ticket agent in procuring a criminal prosecution will be regarded as within the scope of his authority depends upon the specific duties which the employer has imposed upon him and the particular facts and circumstances under which the criminal proceedings were instituted; in some instances, where the prosecution was commenced for the purpose of protecting property in his custody, the agent has been held to be acting within the scope of his employment.

"Thus, the defendant's station agent, in suing out a warrant of arrest against the plaintiff for unloading a freight car and carrying away the shipment without paying the proper freight charges, was held to have acted within the scope of his authority in *Chicago, R. I. & P. R. Co.* v. *Gage*

(1918) 136 Ark. 122, 206 S.W. 141, on the ground that although the particular method used by the agent in protecting the property was unauthorized, he was nevertheless placed in custody of his principal's property and had the implied power to use whatever means were necessary for its protection.''

Part of Compton's duties were to protect all baggage. The processes of the law were put into action as soon as Compton received word that the articles had been taken. We believe that it was a question of fact for the jury to determine whether or not the purpose of the complaint was to recover the property or to punish the plaintiff for a wrongful act. In *Pierre* v. *Great Atlantic etc. Tea Co.*, 4 Cal.App.2d 468 [40 P.2d 909], which was an action for malicious prosecution and in which a nonsuit was reversed, the defendant corporation operated a chain of grocery stores, each of which was managed by a representative in charge. Plaintiff entered one of defendant's stores which she had patronized previously. While making a purchase the manager asked her if her name was Anna Fields. She denied it. The manager then said that he knew who she was because he had been looking for her for the reason that she owed $16.50 for a ''bum check.'' An argument ensued and she started to leave when the manager told her to pay the $16.50 or he would send her to jail. She left and later the manager and a police officer approached her. After some discussion the manager told the officer, ''I gave her a chance to pay that $16.50 check and she wouldn't do it. You take her in charge and I will sign the complaint.'' In reversing a nonsuit the court said at page 471: ''In the instant case it was a question of fact to be submitted to the jury as to whether . . . [the manager] was acting for his employer in attempting to collect for the latter money to reimburse it for a check which had been cashed during the course of its business, and was using criminal process to accomplish this result.''

In the Pierre case the court recognized the rule enunciated in *Allen* v. *London etc. Ry. Co.*, L. R., 6 Q. B. 65, which is the leading case on the subject. In that case Allen asked defendant's clerk for a second-class ticket for Waterloo station for which he tendered in payment a two-shilling piece. He was given the ticket and some change including a French coin which he refused to accept. He insisted on an English coin instead. The clerk refused and Allen reached over the counter and attempted to place his hand into the till which contained coin. He was seized by the clerk who insisted that a police-

man on duty in the station arrest him. Allen was arrested and the next day a magistrate dismissed the charge of attempted robbery with which he had been charged. He then brought an action for assault and false imprisonment. After the jury rendered a verdict in his favor, the court entered a nonsuit in defendant's favor.

In affirming the judgment the learned judge said:

". . . I am inclined to think that, if a man in charge of a till were to find that a person was attempting to rob it, and he could not prevent him from stealing the property otherwise than by taking him into custody, the person in charge of the till might have an implied authority to arrest the offender; or if the clerk had reason to believe that the money had been actually stolen, and he could get it back by taking the thief into custody, and he took him into custody with a view of recovering the property taken away, it might be that that also might be within the authority of a person in charge of a till. I am not, however, prepared to pronounce a decided opinion on these supposed cases; the present case is altogether different. There is a marked distinction between an act done for the purpose of protecting the property by preventing a felony or of recovering it back, and an act done for the purpose of punishing the offender for that which has already been done. There is no implied authority in a person having the custody of property to take such steps as he thinks fit to punish a person who he supposes has done something with reference to the property which he has not done. . . . [T]here is an implied authority to do all those things that are necessary for the protection of the property entrusted to a person, or for fulfilling a duty which a person has to perform."

In the instant case Compton agreed to properly protect baggage and express and to assume full liability for loss. As soon as the incident was reported to Compton he reported it to the police. Compton could not recall if he wanted him picked up or arrested. It is clear that Compton had a duty to protect the parcel. The evidence is not clear whether the processes of the law were put in operation for the purpose of recovering the property or for punishing Shoopman. However, the immediate action by Compton would permit the jury to infer that the purpose, or one of his purposes, was to recover the property so that he would not be liable for any loss. We believe that a question of fact was presented for the jury's determination and that upon the record in the instant case it

cannot be held as a matter of law that Compton was not acting within the scope of his employment by Greyhound. It was therefore error for the court to grant a nonsuit as to respondent Greyhound.

Appellant contends also that even if Compton and Lewis were found to be independent contractors the jury could hold Greyhound responsible on the basis of Greyhound's ratification of their acts. It has been held that an employer is responsible for the willful and malicious acts of an employee which he has ratified. Failure to discharge an employee or agent guilty of oppressive acts towards patrons of the employer is in itself evidence to show ratification. (*McChristian* v. *Popkin,* 75 Cal.App.2d 249 [171 P.2d 85].) If the employer after knowledge or opportunity to learn of the agent's misconduct retains the wrongdoer in service, the employer may make himself liable in punitive damages. In the instant case Compton testified he called Brown of Greyhound about the matter. He also discussed the matter with Brown. While the evidence is not strong, we believe that upon the issue of the propriety of a nonsuit it was sufficient to present an issue for the jury to determine as to knowledge on the part of Greyhound of the acts of Compton and Lewis and ratification of said acts by Greyhound.

Appellant next contends that the court erred in granting a new trial as to respondents Lewis and Compton upon appellant's refusal to accept a reduction in the amount of the verdict from $20,000 to $1,450. The order of the trial court was in the alternative. It read that if the reduction was not accepted then the motion for a new trial was granted on the ground of insufficiency of the evidence.

While it would seem that a reduction from $20,000 to $1,450 is a rather large deduction, we cannot say that it was not within the power of the court to make such an order in the instant case. For ''[t]he determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears, and the order will be affirmed if it may be sustained on any ground, although the reviewing court might have ruled differently in the first instance.'' (*Shaw* v. *Pacific Greyhound Lines,* 50 Cal.2d 153, 159 [323 P.2d 391].) The trial court filed a lengthy memorandum decision and order upon the motion for a new trial which indicates quite clearly that the court felt that the amount of damages

awarded by the jury was "so grossly excessive as to indicate the existence of passion and prejudice in the mind of the jury." The court stated:

". . . There was a paucity, if not a complete absence, of evidence concerning injury to plaintiff's reputation and good name, his wounded feelings, or his being subjected to ridicule, insult and oppression, so only an infinitesimal portion of the verdict could be supported by the evidence on that basis. It is also to be noted that there is no evidence of any publication of the incident or the charges against plaintiff as a result thereof.

"For a variety of reasons the court views plaintiff's testimony as to damages with some skepticism. He offered no supporting evidence to show that he lost his job as a result of the incident or to substantiate his record of earnings. . . ."

In passing upon a motion for a new trial it is the function of the trial judge to make an independent appraisal of the evidence, including all permissible inferences, and it is his duty to grant a new trial if he is of the opinion that the verdict is clearly against the weight of the evidence.

In the instant case the trial court weighed the evidence and reached the conclusion that the evidence did not justify a larger verdict than $1,450 and made its conditional order accordingly. We cannot say that the court's conclusion is without support in the record and the order granting the new trial must therefore be affirmed.

Defendants Compton and Lewis filed an appeal in the alternative, stating that if this court reversed the order granting them a new trial and reinstating the judgment in favor of plaintiff, then said defendants appeal from the judgment as reinstated. In view of the fact that we have concluded that the order granting a new trial should be affirmed, it is unnecessary to discuss the contentions of said defendants in said cross-appeal.

The judgment of nonsuit in favor of Pacific Greyhound Lines is reversed; the order granting the motion of defendants Compton and Lewis for a new trial is affirmed. Appellant to recover his costs on appeal against Pacific Greyhound Lines and respondents Compton and Lewis to recover their costs on appeal against appellant.

Van Dyke, P. J., and Warne, J. pro tem.,* concurred.

---

*Assigned by Chairman of Judicial Council.