[Civ. No. 62342. Second Dist., Div. One. Oct. 4, 1982.]

MICHAEL S. LARGEY, Plaintiff and Respondent, v.
INTRASTATE RADIOTELEPHONE, INC., Defendant and Appellant.

**COUNSEL**

Bushkin, Kopelson, Gaims & Gaines, Jerry K. Staub, Lascher & Lascher and Edward L. Lascher for Defendant and Appellant.

David R. Glickman and Irwin Thaler for Plaintiff and Respondent.

**OPINION**

**DALSIMER, J.**—Appellant, Intrastate Radiotelephone, Inc., (Intrastate) appeals from a judgment rendered in favor of respondent and against appellant and its codefendant, KHM. KHM has not appealed.

### FACTS

On the morning of March 9, 1976, respondent, Largey, was injured when a car driven by Mr. Robert Kranhold (Kranhold) struck respondent's motorcycle, causing severe and permanent injuries. Kranhold, originally a defendant in this action, settled with respondent prior to trial. The jury found that Kranhold was negligent in causing the accident and that both KHM and appellant were vicariously responsible for Kranhold's negligent conduct. The jury found that respondent was not negligent.

At the time of the accident, Kranhold was driving his personal automobile to an office building on Olive Street in the City of Burbank.

There was a conflict in the evidence concerning Kranhold's purpose in driving to that location. Appellant, a public utility supplying radio-telephone utility service to the general public, occupied the entire first floor and a portion of the second floor of the building in question. KHM occupied the balance of the second floor.

Kranhold was an employee as well as a major stockholder of appellant at the time of the accident.

KHM stands for "Kranhold-Hoffeld-Mann," the three founders of the company. Shortly prior to the accident, all of the stock in KHM had been purchased by Mr. Van Williams (Williams), who became president of the corporation. KHM is a communication sales and service organization that sells and leases two-way radiotelephones as well as pocket pagers and beepers. KHM used appellant's facility almost exclusively for the products that KHM sells. Until Williams bought the KHM stock, the officers of appellant and KHM were closely interrelated. Hoffeld was vice-president and general manager of Intrastate and secretary-treasurer of KHM. Kranhold was vice-president and a member of the board of directors of Intrastate and was a member of the board of directors of KHM. At the time of the accident, Williams was also a stockholder in Intrastate. The building that houses the two businesses is owned by Kranhold, Hoffeld, and Mann.

There exists between the two businesses a "sales and distribution agency agreement." Kranhold signed that agreement on behalf of KHM, and Hoffeld signed it on behalf of appellant. In that agreement, appellant is referred to as "carrier," and KHM is referred to as "agent."

## DISCUSSION

Appellant's appeal is predicated upon the application in this case of the "going and coming" rule. Appellant employs two approaches to this problem. First, it asserts that there was not substantial evidence upon which the jury could make a finding of vicarious liability. Second, appellant asserts that, even if there was substantial evidence, the jury was misinstructed in this regard. Appellant makes additional claims of instructional error.

### EVIDENCE OF AGENCY

Generally, a principal is responsible to third persons for the negligence of its agents, including wrongful acts committed by such agents in the transaction of the principal's business. (Civ. Code, § 2338.) Whether an act is within the scope of employment is a question of fact.

(*Ducey* v. *Argo Sales Co.* (1979) 25 Cal.3d 707, 722 [159 Cal.Rptr. 835, 602 P.2d 755].) At trial, respondent had the burden of proof to establish that the conduct of the tortfeasor, Kranhold, occurred within the scope of his employment. On appeal, however, the burden shifts to the appellant to demonstrate that there is not substantial evidence to support the verdict. Thus, the appellate court considers the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference in resolving conflicts in support of the judgment. (*Aceves* v. *Regal Pale Brewing Co.* (1979) 24 Cal.3d 502, 507 [156 Cal.Rptr. 41, 595 P.2d 619].)

■ Appellant asserts that there is a complete absence of evidence upon which the jury could have based its finding of vicarious liability. It seems, however, that appellant bases its appraisal of the evidence on a qualitative rather than a quantitative approach. As respondent candidly concedes, there is no direct evidence that Kranhold was on his way to work for Intrastate on the morning of the accident. Nevertheless, there is substantial circumstantial evidence to that effect.

"[T]he fact that evidence is 'circumstantial' does not mean that it cannot be 'substantial.' Relevant circumstantial evidence is admissible in California. (Evid. Code, § 351.) Moreover, the jury is entitled to accept persuasive circumstantial evidence even where contradicted by direct testimony. [Citations.]" (*Hasson* v. *Ford Motor Co.* (1977) 19 Cal.3d 530, 548 [138 Cal.Rptr. 705, 564 P.2d 857, 99 A.L.R.3d 158].) Inferences may be drawn from circumstantial as well as from direct evidence. (Evid. Code., § 600, subd. (b).)

Kranhold was a consultant for Intrastate. He was on the Intrastate board of directors. For these services, he was paid $15,600 per year, including the year 1976. Kranhold was also employed as a consultant by KHM. The jury could reasonably infer that Kranhold provided the same or similar services to Intrastate as he provided to KHM. There was evidence from which the jury could infer that Kranhold did the majority of his consultant work for both Intrastate and KHM in the field. Intrastate provided Kranhold with Avis and PSA credit cards. Kranhold was paid by Intrastate for being available for discussions about business matters and decision making. Ordinarily those discussions would occur over lunch between Kranhold and Hoffeld. The lunches occurred often, at least once or twice a month. Also, as often as three times a week, Kranhold went to the Intrastate offices either to pick something up or to drop something off. On other occasions Kranhold met early in the morning with either Intrastate or KHM personnel for breakfast. While Kranhold was doing work for KHM,

he would also stop at the Intrastate offices, as often there were business discussions between Kranhold and the Intrastate manager.

Kranhold's testimony that he had been asked to come to work for KHM to "baby-sit the telephones" and to do other work at the KHM offices because Williams had an acting job on that day was impeached. Williams testified that he did not recall asking Kranhold to work on the day of the accident, that he was not acting at that time and hadn't been for some period before then, and that in fact he was at KHM working on the day of the accident.

The accident occurred at the intersection where the KHM-Intrastate office building is located. Kranhold arrived there 30 minutes prior to the time that the KHM offices opened but after Intrastate personnel arrived at their offices.

Based on all of the evidence, the jury could reasonably infer that on the morning in question Kranhold was intending to meet with Intrastate personnel, that he was going to the Intrastate offices to pick something up or to drop something off, or that he was on his way to an Intrastate board of directors meeting. In sum, there was sufficient evidence for the jury to find that Kranhold was an Intrastate employee who worked both in and out of Intrastate's place of business, who had no set hours of work, and who was going to the Intrastate offices on the morning in question.

Aside from the substantial evidence that Kranhold was within the scope of his employment by Intrastate, there is also substantial evidence to support Intrastate's liability as the principal of its agent, KHM. The respondent advanced both of these theories during the trial and argued to the jury and the court that the Intrastate-KHM agreement permitted the finding that even though Kranhold was working for KHM on the morning in question, KHM was the agent of Intrastate. Thus, when Kranhold committed a tort working as a KHM employee as was impliedly found by the jury, he was also working within the scope of the KHM-Intrastate agency agreement. Although the agency agreement between KHM and Intrastate contains a clause negating agency between the two companies, such a clause is not controlling. "[C]ontractual terms are not conclusive on the issue. [Citations.] Moreover, numerous attempts to conceal employment by formal documents purporting to create other relationships have led the courts to disregard such terms whenever the acts and declarations of the parties are inconsistent therewith." (1 Witkin, Summary of Cal. Law (8th ed. 1973) Agency and Employment, § 29, p. 662.)

Not only was the agreement itself designated an agency agreement, but also there was testimony of several witnesses that KHM was Intrastate's agent. In examining the provisions of the sales and distribution agency agreement, it becomes apparent that the jury could find that Intrastate has the right of control over KHM. KHM must obtain approval from Intrastate on advertising; Intrastate has the right to obtain lists and documents from KHM; KHM must pass potential subscribers through to Intrastate; and KHM's conduct must meet the standards set forth in the contract. In paragraph 6 Intrastate agrees to maintain compatibility of product with service, but retains the right to change service without notice, thus rendering obsolete KHM's products. In this manner, Intrastate has control over the products that KHM sells. Intrastate maintains control over the the prices that may be charged by KHM. Ultimate control and responsibility of the standard and quality of service is retained by Intrastate. Intrastate retains the right to cancel the agreement upon 10 days written notice if it deems that KHM has violated the terms of the agency agreement and has the right to cancel it upon 60 days notice without any violation. Upon cancellation, KHM must assign all contracts it has entered into with subscribers to Intrastate. Furthermore, the contract provides, "This is a personal appointment as agent, and neither agent's interest herein nor any part of it shall be transferred or assigned by agent without prior and express written consent thereto by carrier."

As was observed by the court in *City of Los Angeles* v. *Meyers Bros. Parking System, Inc.* (1975) 54 Cal.App.3d 135, 138 [126 Cal.Rptr. 545], "Agency and independent contractorship are not *necessarily* mutually exclusive legal categories as independent contractor and servant or employee are. In other words, an agent may also be an independent contractor. [Citation.] One who contracts to act on behalf of another and subject to the other's control, except with respect to his physical conduct, is both an agent and an independent contractor. [Citation.]" (Original italics.)

Again, in *Shoopman* v. *Pacific Greyhound Lines* (1959) 169 Cal.App.2d 848, 853 [338 P.2d 3], the court stated, "The mere fact that the agreement provided that [the agent] was an independent contractor does not compel a finding that in causing the [tort] he was not acting within the scope of his employment as agent." The court observed that the most important factor in determining whether or not a person is an independent contractor is "the right to control the manner and means of accomplishing the result desired." (*Ibid.*)

BAJI No. 13.20 was given at the request of both the appellant and KHM. This instruction properly incorporates the concept of control by stating that

control over the manner in which business is done is the distinguishing factor between an agent and an independent contractor.

Lastly, there was evidence that KHM used Intrastate facilities almost exclusively for products that KHM sold. Kranhold testified that on the day of the accident he was going to supervise sales. Thus, the jury could infer that Kranhold was going to be working within the course and scope of the sales and distribution agreement by supervising sales of Intrastate's services and that Kranhold was going to work indirectly for Intrastate on the morning in question.

### The Going and Coming Rule

■ Ordinarily, while an employee is going to or coming from his place of employment, he is outside the scope of his employment during that period. There are many exceptions to the going and coming rule. If it is an implied or express condition of his employment that the employee use his vehicle in attending to his duties, then the employer will be vicariously liable for any accident incurred while the employee is driving to or from work.

Although the applicability of workers' compensation cases to tort cases is not unquestioned (see *Church* v. *Arko* (1977) 75 Cal.App.3d 291 [142 Cal.Rptr. 92]), the Supreme Court on two occasions has relied on workers' compensation cases in deciding tort cases. In *Hinman* v. *Westinghouse Elec. Co.* (1970) 2 Cal.3d 956, 962, footnote 3 [88 Cal.Rptr. 188, 471 P.2d 988], the court stated, "Although the test under the workmen's compensation law of 'arising out of and in the course of the employment' (Lab. Code, § 3600), is not identical with the test of 'scope of employment' under the *respondeat superior* doctrine . . . the two tests are closely related [citation]." In reaching its decision in *Hinman*, the court relied upon workers' compensation cases. The court did so again in *Ducey* v. *Argo Sales Co., supra,* 25 Cal.3d 707, 722, citing *Hinman*. In *Huntsinger* v. *Glass Containers Corp.* (1972) 22 Cal.App.3d 803 [99 Cal.Rptr. 666], Mr. Fell was employed as a technical service representative. Fell performed his duties both in the company office and in the field. In carrying out the duties of his employment, Fell was required to drive a vehicle owned by him. When he had the accident in question, Fell was driving from the Whittier office of the company directly to his home. The accident caused the death of a third party, whose survivors brought the action against Fell's employer. The reviewing court stated, "Thus, while it may constitute pouring new wine into an old bottle, the 'going and coming' rule and its exceptions in the tort cases are concerned with the allocation of the economic cost of an injury resulting from a risk incident to business

enterprise, and the social philosophy underlying the rule and its exceptions in the tort field is now substantially similar to that underlying workmen's compensation. [Citation.]" (*Id.*, at p. 808.) The court went on to hold that the required use of Fell's automobile in carrying out his employment duties benefited his employer. (*Id.*, at p. 810.)

The evidence is sufficient to establish that Kranhold performed his duties both in the headquarters of appellant as well as at various places in the field and that he was called upon to attend meetings at various times of the day and in various places. Thus, the jury could find that an implied requirement of Kranhold's employment was that he provide his own transportation and that the liability of Intrastate is not barred by the going and coming rule.

An exception to the going and coming rule has also been recognized where a negligent act is committed while the employee is engaged in a special errand for the employer. (*Ducey* v. *Argo Sales Co., supra,* 25 Cal.3d 707, 722.) Although Kranhold testified that he was going to KHM because he had been called there by Williams to supervise sales and to cover the telephones, his testimony was contradicted by Williams, as indicated above. Based on the evidence reviewed above, it was reasonable for the jury to infer that Kranhold had been called by Intrastate to come in early that morning for the purpose of consulting. On the other hand, if the jury believed Kranhold was going to work at KHM to answer phones and supervise sales, this was "highly extraordinary work" for Kranhold, as the testimony indicated that Kranhold did approximately 99 percent of his work for KHM outside of the office. Kranhold's supervising sales for KHM was work that would be within the course and scope of the Intrastate-KHM agency agreement. (See *ante*, pp. 666-667.)

## INSTRUCTIONS

■ Appellant objects to the going and coming rule instructions given by the court, stating that such instructions were requested by "the KHM Company, not by Intrastate." The record indicates the contrary. During the trial, Mr. Staub, who was appearing on behalf of appellant, stated to the court, "I want to put on the record that the request for jury instructions that was offered by defendant KHM has been adopted by defendant Intrastate Radiotelephone in connection with this matter, and I think the court reviewed them in that light."

It is true that the appellant objected to the court's modification of the instruction offered by defendants, but that objection went only to the fourth exception to the general rule (paragraph 4), which was appended to the tendered instruction. This paragraph reads as follows: "Where the

employee works both in and out of the employer's place of business, has no set hours of work, was coming to or from the employer's place of business for a purpose connected with his employment for that employer.''

Our Supreme Court has stated, ''In substance the courts have held non-compensable the injury that occurs during a local commute enroute to a fixed place of business at fixed hours in the absence of special or extraordinary circumstances. The decisions have thereby excluded the ordinary, local commute that marks the daily transit of the mass of workers to and from their jobs; the employment, there, plays no special role in the requisites of portage except the normal need of the presence of the person for the performance of the work. [¶] On the other hand, many situations do not involve local commutes enroute to fixed places of business at fixed hours. These are the extraordinary transits that vary from the norm because the employer requires a special, different transit, means of transit, or use of a car, for some particular reason of his own." (*Hinojosa* v. *Workmen's Comp. Appeals Bd.* (1972) 8 Cal.3d 150, 157 [104 Cal.Rptr. 456, 501 P.2d 1176].)

In its objections to paragraph 4, appellant asserts that ''no authority has ever been vouchsafed for that proposition and none exists." We agree with respondent that paragraph 4 is a correct statement of the exception to the going and coming rule recognized in *Richards* v. *Metropolitan Life Ins. Co.* (1941) 19 Cal.2d 236 [120 Cal.Rptr. 650] and *Huntsinger* v. *Glass Containers Corp., supra,* 22 Cal.App.3d 803. In *Richards,* the plaintiff brought an action to recover for damages caused when defendant's employee, driving his own car without compensation from his employer, had an accident on the way to work in the morning. The employee was an insurance agent who worked on salary plus commission and who spent part of his time in the field and part in the office. He had no certain hours. Although it does not appear from the *Richards* case that there was an express requirement that Richards have and use an automobile in going about his work, the inference that such a requirement existed is strong.

*Hinojosa* was a case where the employee moved from place to place during his day's work. There the employee was a farmworker going from ranch to ranch, and there was no express requirement that he have an automobile, but, as the court stated, ''Although in the instant case the requirement for the car was implicit rather than express, the use of a vehicle can be 'an implied or express condition of . . . employment.' [Citation.]" (*Hinojosa* v. *Workmen's Comp. Appeals Bd., supra,* 8 Cal.3d 150, 161.) In the case at bench, the evidence concerning the duties of Kranhold as a consultant and the manner and places at which he performed those duties could, as stated above, be found by the jury to

impliedly require that he use his automobile. The fact that appellant provided Kranhold with an Avis car rental credit card verifies such an inference.

If indeed the going and coming instruction as given might be too broad, particularly when read in an isolated context, it does not necessarily follow that the giving of the instruction constituted error in the case at bench. "It is a fundamental rule that all of the instructions must be read together and construed as a whole. [Citation.] If, so construed, they state the law fairly, the charge is proper." (4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 244, p. 3057.) Thus, it may be that not every employee who works both in and out of the employer's business, who has no set hours of work, and who is coming to or going from the employer's place of business for purposes connected with his employment is excepted from the going and coming rule. As appellant argues, an appellate court justice might be described by such an instruction; however, the distinction is that an appellate court justice sets his own hours, makes his own determinations concerning when and where to work, and is, in the last analysis, under the specific control of no one. On the other hand, the jury could well have determined from the evidence in this case that the position of Kranhold was such that his employment required him to make himself available when called at the various places where his consulting work was accomplished.

In determining whether the giving of an instruction that is not entirely proper is a ground for reversal, the court must determine whether the instruction as given misled the jury. "The underlying principle is that, under the constitutional prohibition against reversal for nonprejudicial error, it must be shown that the error was likely to *mislead* the jury. If this does not affirmatively appear, there is no reversible error. [Citations.]" (4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 242, p. 3056, original italics.)

Appellant argues that the Supreme Court in *Ducey* v. *Argo Sales Co., supra,* 25 Cal.3d 707, 721-723, set out definitive parameters around the exceptions to the going and coming rule and suggests that these parameters were enlarged by the trial judge herein. We do not so read *Ducey.* In *Ducey,* as in the case at bench, the trial judge submitted the question of the employee's agency to the jury. In *Ducey,* the jury, acting under those instructions, found that the employee, Mrs. Glass, was not acting in the scope of her employment at the time of the accident. Although there was evidence in that case upon which the jury could have made an opposite finding, the holding in *Ducey* merely was that there was sufficient evidence to support the jury's finding. The court stated, "The evidence does not establish as a matter of law that Argo Sales Co. should have been held liable for the results of Glass' negligent

conduct." (*Id.*, at p. 723.) The facts in the case at bench plainly presented a jury question which was well argued by competent counsel and submitted to the jury under proper instructions. Although the evidence would have supported a contrary verdict, that, of course, is not the test.

Appellant objects to the fact that the court instructed the jury, "If weaker and less satisfactory evidence is offered by a party, when it was within his power to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust." (BAJI No. 2.02 (6th ed. 1977).)

At issue in this case was the purpose for Kranhold's visit to the building where defendants had their offices. Varied reasons were given as to the purpose of that visit, the testimony of the principals of the respective businesses being contradictory. The evidence suggested that Kranhold's visit might have been for the purpose of a board meeting to be held on the date in question. Hoffeld testified that he did not remember when the board meeting was, although he did think it was in the latter part of October or the first part of November, a period which included the accident date. The purpose of the instruction was that, if indeed Kranhold had not been on the way to the corporation for the purpose of a stockholders' meeting, such fact could have been easily demonstrated by Intrastate's production of its corporate records in court. Appellant's argument that the records would not have been the best evidence misses the mark. The case cited by appellant, *Bank of Costa Mesa* v. *Losack* (1977) 74 Cal.App.3d 287, 291-292 [141 Cal.Rptr. 550], dealt with the evidentiary doctrine known popularly as "the best evidence rule." What is in that context the best evidence or what is secondary evidence is irrelevant to the problem at bench. Evidence Code section 412 deals not with "best" evidence, but with "weaker and less satisfactory" evidence. A jury could well find corporate records concerning the date of a board meeting to be much stronger and more satisfactory than the recollection several years later of persons who attended such meeting. Appellant's further objections to instructions have been carefully examined by us, and we find them to be without merit.

The judgment is affirmed.

Spencer, P. J., and Lillie, J., concurrred.

A petition for a rehearing was denied November 1, 1982, and appellant's petition for a hearing by the Supreme Court was denied December 22, 1982.