Filed 6/22/20; Modified and certified for pub. 7/14/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| ALYOSHA MATTEI et al., | B291377 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC650798) |
| v. | |
| CORPORATE MANAGEMENT SOLUTIONS, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dalila Corral Lyons, Judge.  Reversed and remanded.

Harris & Ruble, Alan Harris, David Zelenski and Min Ji Gal for Plaintiffs and Appellants.

Rosen Saba, Ryan D. Saba, Elizabeth L. Bradley and Tyler C. Vanderpool for Defendants and Respondents.

_____

Alyosha Mattei, Greg Jensen, Scott Todd and Janos Csoma, all members of the International Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists and Allied Crafts (IATSE), sued Corporate Management Solutions, Inc. and its owner and president, Anthony Low (collectively CMS), for wage-and-hour violations under the California Labor Code incurred in the 2016 production of a television commercial for Ulta Beauty, Inc., which operates a chain of beauty stores.  The superior court granted CMS's motion for summary judgment on the ground it was not an employer of the four IATSE members.  We reverse.

**FACTUAL AND PROCEDURAL BACKGROUND**

Mattei and his colleagues are lighting technicians who belong to Local 728 of IATSE and have worked on numerous television commercial productions.  The production of television commercials has traditionally been governed by a series of collective bargaining agreements between IATSE and the Association of Independent Commercial Producers, Inc. (AICP): The Ulta Beauty commercial was produced in June 2016 under the 2016 Commercial Production Agreement (CPA or Agreement).  CMS is a member of AICP and a signatory to the CPA.  The CPA, among other provisions, bars IATSE members from working on non-union television commercial productions.

The Ulta Beauty commercial was developed by MullenLowe U.S., Inc., an advertising agency, which hired Diktator US, LLC to produce the commercial.  Because Diktator was not a CPA signatory, Diktator paid CMS $2,000 to borrow CMS's signatory status to enable it to hire union crewmembers.[1]  According to

---

[1]     The written contract between CMS and Diktator was not produced for reasons not disclosed in the record.  Low described

2

Low, this practice is common in the industry and is a large part of CMS's business.[2] When hired to provide signatory services, CMS does not set the wages, hours or working conditions for the employees on the production (most of which are already set by the CPA), hire or fire them or provide the location or any instrumentalities for the production. CMS is not a payroll company and does not issue payroll. Instead, the non-signatory production company submits timecards to the payroll service (selected by the client), which generates a "payroll edit" listing all calculations for wages, payroll taxes and benefits that is sent to both CMS and the non-signatory production company. The non-signatory production company reviews those documents; and, once approved, CMS sends the company an invoice for the exact amount of the approved payroll invoice, plus CMS's fee. The non-signatory production company then remits payment to CMS. Upon receipt, CMS notifies the payroll company, which

---

CMS's typical agreement in his deposition: Generally, the terms require CMS to administer the below-the-line crew payroll (including all union payroll and pension and health care contributions, payroll taxes, workers' compensation and processing fees) once the crew is engaged to render services on the production until the crew is paid its final wages. The non-signatory production company agrees to adhere to the terms and conditions of all applicable collective bargaining agreements, including the AICP-IATSE CPA, and to pay CMS a fee for its services. Diktator paid CMS $2,000 for its signatory services.

[2] CMS also provides production services when requested. In those situations, CMS assists the production company in paying bills and managing production funds and by providing financial, accounting and insurance services to the production company. CMS did not provide those services to Diktator.

withdraws the wages from CMS's account and pays the employees.

In the case of the Ulta Beauty commercial, this process failed because MullenLowe, Diktator's client, did not pay Diktator on time for the costs of the production. Diktator, in turn, could not deposit funds for the wages with CMS. Seeking payment, Low spoke with several representatives of Diktator but ultimately declined to advance the wages due on the production.[3] The employees were forced to wait several weeks past the due date, prescribed by Labor Code sections 201.5 and 204, for the wages they had earned on the production.

Mattei and his colleagues sued MullenLowe, Diktator and CMS for various Labor Code violations, including late payment of wages.[4] They contend CMS, as a signatory to the CPA, was defined as an employer and bound by the CPA's terms to pay its employees on a timely basis, even if Diktator did not provide it

---

[3] Low acknowledged CMS had advanced payment for some clients in the past, including Paramount Pictures, but he was not familiar with Diktator and did not want to advance funds he did not know would be repaid.

[4] The operative first amended complaint asserts causes of action for violations of Labor Code sections 203, 510 and 1194 for failure to pay timely minimum wages and overtime, section 226 for failure to provide a proper wage statement identifying the legal name of the employer and section 2698 for civil penalties on behalf of the plaintiffs individually and as representatives of the State of California and all aggrieved employees, as permitted by PAGA, the Labor Code Private Attorneys General Act of 2004 (Lab. Code, § 2698 et seq.). Low was added as a defendant in the first amended complaint. MullenLowe, Diktator and other individual defendants are not parties to this appeal.

4

with the necessary funds.  From the employees' perspective, both CMS and Diktator were listed as the production companies on their call sheets; and CMS was listed as the customer of the payroll company on their payroll stubs.[5]  Mattei stated he understood CMS to be a union signatory producer responsible for payment of wages under the CPA.

Low knew CMS was listed as one of the production companies on the call sheets.  CMS's director of business affairs, Cathryn Hacker, acknowledged it is routine to list employers at the top of the call sheet.[6]  Low also admitted that CMS, by lending its signatory status to Diktator, stood in for Diktator with respect to the CPA.

Based on these facts, the superior court determined that CMS was not an employer within the meaning of the applicable Industrial Welfare Commission (IWC) wage order[7] or under

---

[5]     The payroll stub also lists the payroll company as the "employer of record," which Low acknowledged was common.  Payroll companies are not joint employers under well-established case law.  (See *Futrell v. Payday California, Inc.* (2010) 190 Cal.App.4th 1419, 1435; see also *Goonewardene v. ADP, LLC* (2019) 6 Cal.5th 817, 821-822 [independent payroll services company not liable to employees of client on claims of third-party contract beneficiary, negligence and negligent misrepresentation].)

[6]     In her role as director of business affairs Hacker "administrates the signatory division of CMS."

[7]     IWC wage order No. 12-2001 governs the motion picture industry, including the production of television commercials.  (See Cal. Code Regs., tit. 8, § 11120, subd. (2)(K).)  In its ruling the superior court incorrectly identified IWC wage order

common law.  The court granted summary judgment in favor of CMS and Low and entered judgment against Mattei, Jensen, Todd and Csoma.

## DISCUSSION

### 1. *Standard of Review*

A motion for summary judgment is properly granted  only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  (Code Civ. Proc., § 437c, subd. (c); see *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618.)  We review a grant of summary judgment de novo and decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law.  (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347; *Schachter v. Citigroup, Inc.* (2009) 47 Cal.4th 610, 618.)  The evidence is viewed in the light most favorable to the nonmoving party.  (*Ennabe v. Manosa* (2014) 58 Cal.4th 697, 703; *Schachter*, at p. 618.)

When a defendant moves for summary judgment in a situation in which the plaintiff at trial would have the burden of proof by a preponderance of the evidence, the defendant may, but need not, present evidence that conclusively negates an element of the plaintiff's cause of action.  Alternatively, the defendant may present evidence to "'show[] that one or more elements of the cause of action . . . cannot be established' by the plaintiff."  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853; see Code Civ. Proc., § 437c, subd. (p)(2).)  """The moving party bears

---

No. 11-2001, which governs the broadcasting industry.  The definition of an employer is the same under both wage orders.

the burden of showing the court that the plaintiff "has not established, and cannot reasonably expect to establish,'" the elements of his or her cause of action.""" (*Ennabe v. Manosa*, *supra*, 58 Cal.4th at p. 705; accord, *Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720; *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1002-1003 ["the defendant must present evidence that would preclude a reasonable trier of fact from finding that it was more likely than not that the material fact was true [citation], or the defendant must establish that an element of the claim cannot be established, by presenting evidence that the plaintiff 'does not possess and cannot reasonably obtain, needed evidence'"].)

2. *CMS Failed To Demonstrate It Is Not an Employer Within the Meaning of IWC Wage Order No. 12-2001*

a. *The broad IWC definition of employer*

To impose liability for violations of the Labor Code, the plaintiffs must show that CMS is an employer as defined in wage order No. 12-2001. (See *Martinez v. Combs* (2010) 49 Cal.4th 35, 52 (*Martinez*).) Each wage order defines the term "employ" as "to engage, suffer, or permit to work," and the term "employer" as any person "who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person." (E.g., Cal. Code Regs., tit. 8, § 11120, subd. 2(D), (F).) "To employ, then, under the IWC's definition, has three alternative definitions. It means: (a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship." *Martinez*, at p. 64.) ""The question of whether an employment relationship exists "'is generally a question reserved for the trier

7

of fact.'" . . . This remains true '[w]here the evidence, though not in conflict, permits conflicting inferences.' . . . However, if neither the evidence nor inferences are in conflict, then the question of whether an employment relationship exists becomes a question of law."'" (*Aleksick v. 7-Eleven, Inc.* (2012) 205 Cal.App.4th 1176, 1187.)

In *Martinez* the Supreme Court examined the wage order definition of employer to determine whether farmworkers who complained of Labor Code violations could sue a produce merchant as a joint employer with the grower who had hired them. (*Martinez*, *supra*, 49 Cal.4th at pp. 42-43.) Although the Court concluded the produce merchant was not a joint employer, it acknowledged multiple entities may be employers where they "control different aspects of the employment relationship. This occurs, for example, when one entity (such as a temporary employment agency) hires and pays a worker, and another entity supervises the work." (*Id.* at p. 76; see *Duffey v. Tender Heart Home Care Agency, LLC* (2019) 31 Cal.App.5th 232, 254 [definition of employment is "'phrased . . . in the alternative (i.e., "wages, hours, *or* working conditions"),' and thus control over any one of the three creates an employment relationship"; triable issue of fact as to whether placement agency exercised control over wages]; *Castaneda v. Ensign Group, Inc.* (2014) 229 Cal.App.4th 1015, 1019 ["[a]n entity that controls the business enterprise may be an employer even if it did not 'directly hire, fire or supervise' the employees"; triable issue of fact as to defendant's control].) "Joint employment occurs when two or more persons engage the services of an employee in an enterprise in which the employee is subject to the control of both." (*In-Home Supportive Services v. Workers' Comp. Appeals Bd.* (1984)

8

152 Cal.App.3d 720, 732; accord, *Guerrero v. Superior Court* (2013) 213 Cal.App.4th 912, 917, 955.)

Describing the second prong of the IWC definition of employer, the Supreme Court observed, "The verbs 'to suffer' and 'to permit' . . . are terms of art in employment law." (*Martinez, supra*, 49 Cal.4th at p. 64.) The "suffer or permit" definition, used in wage orders since 1916, has its roots in the language of early 20th-century statutes prohibiting child labor. (*Id.* at p. 69.) "Statutes so phrased were generally understood to impose liability on the proprietor of a business who knew child labor was occurring in the enterprise but failed to prevent it, despite the absence of a common law employment relationship." (*Ibid.*) As the Court explained, this "historical meaning continues to be highly relevant today: A proprietor who knows that persons are working in his or her business without having been formally hired, or while being paid less than the minimum wage, clearly suffers or permits that work by failing to prevent it, while having the power to do so." (*Id.* at p. 69; accord, *Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903, 939.) The basis for liability under this definition is thus a defendant's failure "to prevent the unlawful condition" or "'to perform the duty of seeing to it that the prohibited condition does not exist.'" (*Martinez*, at p. 69, italics omitted.) It "'rest[s] upon principles wholly distinct from those relating to master and servant'" (*id.* at p. 69) and "reache[s] irregular working arrangements the proprietor of a business might otherwise disavow with impunity" (*id.* at p. 58). Thus, the definition of "employer" is "broad enough to reach through straw men and other sham arrangements to impose liability for wages on the actual employer." (*Id.* at p. 71; see *Dynamex*, at p. 953 ["wage orders are the type of remedial

legislation that must be liberally construed in a manner that serves its remedial purposes"]; *Augustus v. ABM Security Services, Inc.* (2016) 2 Cal.5th 257, 262 ["we liberally construe the Labor Code and wage orders to favor the protection of employees"].)

The third prong, "to engage," embodies the common law definition of the employer-employee relationship and, again, harkens back to the exercise of control. (*Martinez*, *supra*, 49 Cal.4th at p. 64 ["the verb 'to engage' has no other apparent meaning in the present context than its plain, ordinary sense of 'to employ,' that is, to create a common law employment relationship"]; accord, *Turman v. Superior Court* (2017) 17 Cal.App.5th 969, 986.) "Under the common law, '"[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired."'" (*Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 531.) "Significantly, what matters under the common law is not how much control a hirer *exercises,* but how much control the hirer retains the *right* to exercise." (*Id.* at p. 533.) "In cases where there is a written contract, to answer that question without full examination of the contract will be virtually impossible." (*Id.* at p. 535, citing *Tieberg v. Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 952 [written agreements are a "significant factor" in assessing the right to control]; *Grant v. Woods* (1977) 71 Cal.App.3d 647, 653 ["[w]ritten agreements are of probative significance" in evaluating the extent of a hirer's right to control].) "'"[T]he fact that a certain amount of freedom of action is inherent in the nature of the work does not change the

character of the employment where the employer has general supervision and control over it.""" (*Ayala*, at p. 531.)

> b. *CMS has failed to establish the AICP-IATSE CPA permits a signatory to avoid its responsibilities as an employer when it lends its signatory status to a non-signatory producer*

The Mattei parties contend the CPA bound CMS as a signatory to fulfill its obligations as an employer whether or not Diktator supervised the production, a position CMS disputes and the superior court ignored. Accordingly, we are required to evaluate whether the CPA permits signatories who lend their signatory status to non-signatory production companies to avoid responsibility for wage and hour violations suffered by IATSE-member employees on those projects.

By its own terms,[8] the CPA "is binding on those commercial production companies that have consented . . . in writing to be

---

[8] "Under long-standing contract law, a 'contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.'" (*Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 524.) That intent is interpreted according to objective, rather than subjective, criteria (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126); and the "intention of the parties is to be ascertained from the writing alone, if possible" (Civ. Code, § 1639; see *Hess*, at p. 524). Nevertheless, "[a] contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates." (Civ. Code, § 1647; see *Hess*, at p. 524.)

"'An ambiguity exists when a party can identify an alternative, semantically reasonable, candidate of meaning of a writing. [Citations.] An ambiguity can be patent, arising from the face of the writing, or latent, based on extrinsic evidence.'"

11

bound hereby ('Employer' or 'Employers')," in other words, signatories like CMS. "Employers are engaged in the physical production of commercials pursuant to contracts with advertising agencies and/or advertisers." The CPA "is intended to recognize and address the special needs of the commercial production process. It is the intent of the parties hereto that this Agreement[] establish the wages and working conditions applicable to technicians and artisans employed in the production of commercials." The CPA describes in detail the minimum wages to be paid to employees (Art. XXV), the accumulation of overtime pay (Art. XV), the cancellation of calls (Art. XX), the duration of the work day and work week (Art. XIV), the provision of rest periods (Art. XVI) and meals (Art. XVIII) and travel to locations (Art. XIX). The CPA also requires employers to make pension and welfare contributions on behalf of employees (Art. XXII) and charges employers with the responsibility to ensure that safety standards are maintained during production (Art. XIII, § 1(b)).

What the CPA does not appear to do is relieve signatories of their responsibility to ensure compliance with these detailed provisions when they "lend" their signatory status to a non-signatory production company. Nothing in the CPA expressly addresses the scenario here. To be sure, CMS cites in support of

(*Benedek v. PLC Santa Monica* (2002) 104 Cal.App.4th 1351, 1357; accord, *Eriksson v. Nunnink* (2015) 233 Cal.App.4th 708, 722; see *Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 391 ["'[a]n ambiguity arises when language is reasonably susceptible of more than one application to material facts'"].) "Courts will not strain to create an ambiguity where none exists." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18-19.)

12

its position Article XII, section 1, of the CPA, which states, "The parties recognize that there are factors and requirements unique to the making of television commercials for the advertising industry which may result in the Employer having no effective control over portions of pre-production or post-production work covered by this Agreement. Under [s]uch circumstances, where the Employer does not control the assignment of work, the Employer shall not be responsible or liable under this Agreement for the performance of such work." This section, however, is expressly limited to pre- and post-production work, which is not involved in the Labor Code violations alleged here, and implies by negative pregnant that an employer like CMS is responsible under the CPA for the performance of work during the production phase of a television commercial regardless of the lack of control.

CMS has provided no other facts to support its assertion that signatories can lend their status without remaining liable for employee wage and hour violations. Indeed, notwithstanding Low's suggestion that Diktator alone agreed to be bound by the CPA in the missing contract between the two parties,[9] Hacker

---

[9] We view CMS's failure to produce its contract with Diktator or any sample contract from the same time period with skepticism. (See Evid. Code, § 412 ["If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust"].) "The paradigmatic example of the application of Evidence Code section 412 is where a party has documentation of an event, but instead offers oral testimony by a potentially biased witness. The witness's testimony may be viewed "'with distrust'" under the statute." (*Orange County Water Dist. v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252, 363; see *Pelayo v. J.J. Lee*

acknowledged having seen the contract and stated it provided that both CMS and Diktator would adhere to the terms and conditions of the CPA.

CMS has also failed to support its position with evidence of industry practice.[10] As a signatory to all of the major guilds and unions involved in the production of motion pictures and television commercials, CMS is presumably aware of the policies of those guilds and unions with respect to this question but has pointed us to none that could aid our interpretation of the CPA.[11]

In sum, in light of the clear language of the CPA, absent evidence its obligations were extinguished when CMS lent its signatory status to Diktator, CMS remained an employer with all concomitant responsibilities imposed by that agreement.

---

*Management, Inc.* (2009) 174 Cal.App.4th 484, 495 [failure to produce summons]; *Vallbona v. Springer* (1996) 43 Cal.App.4th 1525, 1537 [failure to produce documentation of financial liabilities]; *Largey v. Intrastate Radiotelephone, Inc.* (1982) 136 Cal.App.3d 660, 672 [failure to produce corporate records concerning board meetings].)

[10] We invited IATSE, AICP, the California Employment Lawyers Association and the California Employment Law Council to file amicus curiae briefs addressing whether a signatory producer lending its status to a non-signatory producer may avoid the responsibilities of an employer imposed by the CPA and IWC wage order No. 12-2001. Only the AICP responded to our request and declined to file a brief.

[11] Low stated in his deposition that CMS has several competitors that offer SAG-AFTRA signatory services but could only name one that offers IATSE signatory services.

c. *A triable issue of fact exists as to CMS's right to control aspects of the production and its failure to ensure compliance with the CPA*

Both the CPA and the Diktator-CMS contract, as that missing contract was described by Hacker, imposed on CMS the obligation to ensure that Mattei and his colleagues were provided with the protections guaranteed by the CPA, including timely payment of wages.[12]  In particular, these contractual obligations not only established the wages and conditions of work for IATSE members, but also enabled Diktator to hire IATSE members under the aegis of CMS's signatory status, conferring upon each an element of control over the hiring of employees.  CMS, as a signatory, was able to list the production with the IATSE Local 728's call steward (the mechanism for hiring Mattei and his

---

[12]     CMS has submitted a copy of an administrative law judge's decision finding that another IATSE member who worked on the Ulta Beauty commercial was employed solely by Diktator and not also by CMS.  That decision does not mention the CPA or the contractual relationship between Diktator and CMS.  As the Supreme Court has explained, "[S]o long as we exercise our independent judgment, we may consider the DLSE's [(Division of Labor Standards Enforcement)] interpretation and the reasons the DLSE proffered in support of it, and we may adopt the DLSE's interpretation as our own if we are persuaded that it is correct." (*Alvarado v. Dart Container Corp. of California* (2018) 4 Cal.5th 542, 561.)  Likewise, we may reject a position taken by the DLSE if we find its rationale unconvincing.  "While the DLSE's construction of a statute is entitled to consideration and respect, it is not binding and it is ultimately for the judiciary to interpret th[e] statute." (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1106, fn. 7, citing *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7-8.)

15

colleagues) and was listed with Diktator as a joint producer on employee call sheets. In addition, CMS administered the below-the-line payroll and ensured that the proper benefit and union dues would be withdrawn and paid into the IATSE benefit pools. By sharing control with Diktator, a trier of fact could conclude CMS was a joint employer with Diktator.

A trier of fact could also find CMS was an employer under the suffer-or-permit prong of the IWC definition. By virtue of its contractual rights and obligations, CMS was in a position "to prevent the unlawful condition" of violations of the CPA and "'to perform the duty of seeing to it that the prohibited condition does not exist.'" (*Martinez, supra,* 49 Cal.4th at p. 69, italics omitted.) CMS appeared not to have this control only because it chose to shut its eyes during productions, thus fostering the perception it was not an employer. That is exactly the type of sham arrangement the suffer-or-permit standard was intended to prevent.

The decision in *Futrell v. Payday California, Inc.* (2010) 190 Cal.App.4th 1419 (*Futrell*), on which CMS heavily relies, does not suggest a different result. In *Futrell* the plaintiff, a security guard who had worked on several television commercials produced by Reactor Films, Inc., sued Reactor and its payroll company, Payday California, Inc., for wage and hour violations under the Labor Code on behalf of himself and others who had provided traffic and crowd control services. (*Id.* at pp. 1424-1425.) The court of appeal affirmed summary judgment in favor of the payroll company, finding Futrell had failed to raise a triable issue of fact Payday was its joint employer. Applying *Martinez*, the court found no evidence Payday exercised any control over Futrell's hours or working conditions. (*Futrell*, at

16

p. 1431.) Moreover, the services Payday performed with respect to his wages were ministerial: "Writing on a clean slate, we conclude that 'control over wages' means that a person or entity has the power or authority to negotiate and set an employee's rate of pay, and not that a person or entity is physically involved in the preparation of an employee's paycheck." (*Id.* at p. 1432.) Similarly, under the suffer-or-permit prong, the court found no evidence Payday had allowed Futrell to suffer work, because there was no evidence Payday had "the power to either cause him to work or prevent him from working." (*Id.* at p. 1434.) Finally, as a matter of common law, Payday did not control the details of Futrell's work. (*Id.* at pp. 1434-1435.)

*Futrell* provides no support to CMS because Futrell was not a union member and Payday was not a party to a collective bargaining agreement governing wages, hours and working conditions of union employees. Payday performed ministerially as a payroll processing company. As a signatory to the CPA, CMS bore an entirely different obligation to the union members who have sued here. There are triable issues of fact related to CMS's right to control the hiring of employees, as well as any obligations by CMS to ensure compliance with the terms of the CPA. Accordingly, the superior court erred in granting summary judgment against Mattei and his colleagues.

17

## DISPOSITION

The judgment is reversed, and the cause remanded with directions to enter an order denying CMS and Low's motion for summary judgment.  Mattei, Jensen, Todd and Csoma are to recover their costs on appeal.

                                        PERLUSS, P. J.

We concur:


FEUER, J.


DILLON, J.[*]

---

[*]     Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| ALYOSHA MATTEI et al.,<br><br>  Plaintiffs and Appellants,<br><br>  v.<br><br>CORPORATE MANAGEMENT SOLUTIONS, INC., et al.,<br><br>  Defendants and<br>  Respondents. | B291377<br><br>(Los Angeles County<br>Super. Ct. No. BC650798)<br><br>ORDER MODIFYING<br>OPINION AND<br>CERTIFYING OPINION<br>FOR PUBLICATION<br>(NO CHANGE IN THE<br>APPELLATE JUDGMENT) |

THE COURT:

It is ordered that the opinion filed herein on June 22, 2020 be modified as follows:

1.  On page 2, in the opening paragraph, the last sentence, "We reverse" is deleted and the following sentence is inserted in its place:

> Because CMS failed to demonstrate it is not an employer within the meaning of that term in the governing Industrial Welfare Commission wage order, we reverse.

2.  On page 14, first full paragraph, the second sentence is modified, keeping footnote 11, to read as follows:

> As a signatory to the agreements with all of the major guilds and unions involved in the production of motion

pictures and television commercials, CMS is presumably aware of the policies of those guilds and unions with respect to this question but has pointed us to none that could aid our interpretation of the CPA.[11]

The opinion in the above-entitled matter was not certified for publication in the Official Reports.  For good cause it now appears that the opinion should be published in the Official Reports, and it is so ordered.

There is no change in the appellate judgment.

_____

PERLUSS, P. J.          FEUER, J.          DILLON, J.[*]

_____

[*] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

2